United States Court of Appeals,

Eleventh Circuit.

No. 96-8149.

James Andrew COLEMAN, Plaintiff-Appellant,

v.

Zell MILLER, Governor, State of Georgia, Defendants-Appellees,

Georgia Division, Sons of Confederate Veterans, et al., Proposed Intervenors.

July 21, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-cv-1673-ODE), Orinda D. Evans, Judge.

Before ANDERSON, Circuit Judge, and FAY and KRAVITCH, Senior Circuit Judges.

PER CURIAM:

James Coleman brought this action to enjoin the flying of the Georgia state flag over Georgia's state office buildings. Coleman, an African-American, alleges that the flying of the Georgia flag, which incorporates the Confederate battle flag emblem, violates his constitutional rights to equal protection and freedom of expression. The district court determined that Coleman had failed to produce sufficient evidence to maintain his claims and granted appellees' motion for summary judgment. Because we likewise conclude that the record contains inadequate factual support for appellant's constitutional claims, we affirm.

I.

In 1879, Georgia adopted as its first official flag a variation of the Confederate national flag consisting of three horizontal red and white stripes and one blue vertical band.[1] The General Assembly added the state seal to this flag in 1902, and this combination of the Confederate national flag emblem and the Georgia state seal remained the official flag of Georgia until the current flag design was adopted in 1956. The 1956 flag statute replaced the Confederate national flag emblem with the Confederate battle flag emblem, which is commonly referred to as the St. Andrew's Cross.

[1]Prior to 1879, Georgia militia units sometimes carried an unofficial state flag that consisted of the state seal emblazoned in the center of a blue background.

Ga.Code Ann. § 50-3-1. The red and blue St. Andrew's Cross, which the Confederate troops carried during the Civil War, now covers two-thirds of the Georgia flag, and the state seal containing the words "Wisdom, Justice and Moderation" covers the remaining third.[2]

The current flag design was adopted during a regrettable period in Georgia's history when its public leaders were implementing a campaign of massive resistance to the Supreme Court's school desegregation rulings.[3] In the 1956 state of the State address, then-Governor Marvin Griffin declared that "there will be no mixing of the races in public schools, in college classrooms in Georgia as long as I am Governor." Later, while addressing the States' Rights Council of Georgia at the beginning of the 1956 legislative session, Governor Griffin announced that "the rest of the nation is looking to Georgia for the lead in segregation." The 1956 General Assembly passed several bills and resolutions as part of its resistance package, including the Interposition Resolution declaring the Supreme Court's school desegregation rulings in *Brown I* and *Brown II* null and void. Introduced as the General Assembly was considering the flag bill, the Interposition Resolution passed both houses over a single dissent.

As many of Georgia's politicians and citizens openly resisted the Supreme Court's desegregation rulings, increasing numbers of white Southerners began expressing renewed interest in their Confederate heritage. It was in this environment of open hostility to the Supreme Court's civil rights rulings and of developing interest in Confederate history that the Georgia General Assembly acted to redesign its state flag. It chose as an official state symbol an emblem that historically had been associated with white supremacy and resistance to federal authority.

The debate over the flag legislation in the two houses of the General Assembly focused on the upcoming Civil War centennial, the cost of changing the flag, whether the designer owned a copyright in the flag, and whether, because the Confederate battle flag belonged to all Southern

---

[2]The different versions of Georgia's flag are depicted in Appendix A.

[3]In 1954, the Supreme Court declared racially segregated public schools unconstitutional, *see Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I* "), and, a year later, the Court ordered that the desegregation of public schools proceed "with all deliberate speed." *Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) ("*Brown II* ").

states, it was an appropriate symbol for the state flag of Georgia. The bill passed the Senate with three dissents and passed the House with 32 dissents and 61 abstentions. Several members of the 1956 General Assembly maintain that factors such as segregation and white supremacy played no role in the decision to adopt the current flag design. One member of the 1956 Assembly, however, insists that the flag was adopted as a symbol of resistance to integration.[4] At least one scholar of this period has concluded that the flag legislation was enacted as a symbol of resistance to the Supreme Court's civil rights rulings.[5]

Roughly forty years after the passage of the flag statute, appellant brought this action under 42 U.S.C. § 1983 alleging, *inter alia,* that the continued presence of the Georgia flag and its Confederate battle flag emblem atop and within Georgia's public buildings unconstitutionally infringes on his rights to equal protection and freedom of expression. Coleman contends that the flag's Confederate symbol, which is often used by and associated with hate groups such as the Ku Klux Klan, inspires in him fear of violence, causes him to devalue himself as a person, and sends an exclusionary message to Georgia's African-American citizens. He also asserts that the flag's use of the Confederate symbol forces him to adopt a message—namely, the endorsement of discrimination against blacks—that he finds morally offensive.

After conducting two hearings to evaluate Coleman's claims, the district court concluded that he had failed to present sufficient specific factual evidence to support them and granted appellees' motion for summary judgment. We review the district court's grant of summary judgment *de novo,* applying the same legal standard as the district court. *Martin v. Commercial Union Insur. Co.,* 935 F.2d 235, 238 (11th Cir.1991). Reviewing the record evidence in the light most favorable

---

[4]James Mackay, who was a member of the General Assembly in 1956, testified that "there was a movement across the South: "Let's adopt the Confederate battle flag as a symbol of resistance to the law of this land.' " (R7:27).

[5]Dan Carter, a professor of Southern History at Emory University testified that "[b]y the mid-1950's, the Confederate battle flag had become the single most important symbol of white supremacy and defiant opposition to federally mandated laws on non-discrimination." Professor Carter concluded that "the well-known symbolic role of the flag at the time makes it difficult for me to imagine that this action was anything but an attempt to bolster the morale of those Georgians struggling to maintain white supremacy." (R2:31).

to appellant, we must determine if there are any genuine issues of material fact that preclude judgment as a matter of law for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, appellant must present more than "mere allegations." *Id.* at 248, 106 S.Ct. at 2510. He must come forward with specific factual evidence sufficient to establish the existence of each element essential to his case on which he will bear the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 320, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e).

## II.

Appellant first contends that the continued display of the Georgia state flag violates the Equal Protection Clause of the Fourteenth Amendment. Because, as appellant concedes, the flag and the 1956 statute adopting the current design are facially neutral, he must satisfy a two-pronged test in order to maintain an equal protection claim. He must first demonstrate that the flying of the Georgia flag produces disproportionate effects along racial lines, and then must prove that racial discrimination was a substantial or motivating factor behind the enactment of the flag legislation. *See Hunter v. Underwood,* 471 U.S. 222, 225-26, 105 S.Ct. 1916, 1919-20, 85 L.Ed.2d 222 (1985); *Lucas v. Townsend,* 967 F.2d 549, 551 (11th Cir.1992); *East-Bibb Twiggs Neighborhood Ass'n v. Macon Bibb Planning & Zoning Comm'n,* 896 F.2d 1264, 1266 (11th Cir.1989).

In order to demonstrate disproportionate impact along racial lines, appellant must present specific factual evidence to demonstrate that the Georgia flag presently imposes on African-Americans as a group a measurable burden or denies them an identifiable benefit. For example, in *Hunter,* the Supreme Court held unconstitutional a provision of the Alabama Constitution that disenfranchised voters who had been convicted of crimes "involving moral turpitude." In finding the requisite discriminatory impact, the Court relied on the fact that in certain Alabama counties at the time of the litigation, "blacks are even by the most modest estimates at least 1.7 times as likely as whites to suffer disenfranchisement" under the challenged section. *Hunter,* 471 U.S. at 228, 105 S.Ct. at 1920 (quoting *Underwood v. Hunter,* 730 F.2d 614, 620 (11th Cir.1984)); *see also United States v. Byse,* 28 F.3d 1165, 1169 (11th Cir.1994) (discussing racial disparities in sentencing).

After carefully reviewing the record, and drawing all inferences in the light most favorable to appellant, we find no evidence of a similar discriminatory impact imposed by the Georgia flag. Appellant relies on his own testimony to demonstrate a disproportionate racial effect. He testified that the Confederate symbol in the Georgia flag places him in imminent fear of lawlessness and violence and that an African-American friend of his, upon seeing the Georgia flag in a courtroom, decided to plead guilty rather than litigate a traffic ticket. This anecdotal evidence of intangible harm to two individuals, without any evidence regarding the impact upon other African-American citizens or the comparative effect of the flag on white citizens, is insufficient to establish "disproportionate effects along racial lines." *See Hunter,* 471 U.S. at 227, 105 S.Ct. at 1920. Coleman also offered the affidavit of another witness who testified that, in his opinion, the flying of the flag promotes violence against blacks and continues to represent a symbol of Georgia's efforts against integration. This mere allegation, without any accompanying support, also is not sufficient to demonstrate a disproportionate racial effect.[6]

We addressed a similar argument in *NAACP v. Hunt,* 891 F.2d 1555 (11th Cir.1990), in which a group of African-American plaintiffs challenged the flying of the Confederate flag above the Alabama capitol dome. We concluded that plaintiffs had failed to prove discriminatory impact. For a unanimous panel, Judge Johnson wrote: "[T]here is no unequal application of state policy; all citizens are exposed to the flag. Citizens of all races are offended by its position." *Id.* at 1562.[7] Like the plaintiffs in *Hunt,* Coleman has presented "no specific factual proof" in support of his claim

---

[6]We recognize that a government action may in some instances violate the Constitution because it encourages private discrimination. *See Reitman v. Mulkey,* 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967); *Creek v. Village of Westhaven,* 80 F.3d 186, 193-94 (7th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 180, 136 L.Ed.2d 120 (1996). There is no evidence in the record of this case, however, that connects the Georgia flag to private discrimination or racial violence.

[7]In *Hunt,* the court first determined that the "entire claim is precluded by res judicata." 891 F.2d at 1561. Nevertheless, the court continued to examine all of the claims on the merits. *Id.* at 1562 ("Because of the controversial concerns raised in this case, it is important that all issues be laid to rest on the merits."). Because the ensuing discussion of the flag controversy does not appear to have been necessary to the disposition of the case, we conclude that it is properly construed as dicta. *See Whiting v. Traylor,* 85 F.3d 581, 584 n. 4 (11th Cir.1996) (characterizing *Hunt's* malicious prosecution discussion as dicta). It goes without saying, however, that we consider Judge Johnson's discussion of the flag issue to be instructive.

that flying the Confederate symbol causes disproportionate racial impact. *See id.* at 1563.

We recognize that the Georgia flag conveys mixed meanings; to some it honors those who fought in the Civil War and to others it flies as a symbol of oppression. But because the Confederate battle flag emblem offends many Georgians, it has, in our view, no place in the official state flag. We regret that the Georgia legislature has chosen, and continues to display, as an official state symbol a battle flag emblem that divides rather than unifies the citizens of Georgia. As judges, however, we are entrusted only to examine the controversies and facts put before us. Based on the record presented to us in this case, we hold that appellant has failed to produce sufficient facts to allow a reasonable trier of fact to conclude that the state has violated his equal protection rights. We therefore conclude that the district court properly granted appellees summary judgment on his equal protection claim.[8]

### III.

Appellant next argues that the Georgia flag violates his First Amendment rights by compelling him to endorse a message that he finds morally objectionable. The First Amendment prohibits governments from forcing an individual to be "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard,* 430 U.S. 705, 711, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977) (holding that state could not inflict criminal penalties on citizens who covered up license plate motto). Similarly, a government cannot force individuals affirmatively to acknowledge a message with which they disagree. *See Board of Education v. Barnette,* 319 U.S. 624, 640, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (prohibiting forced salute and pledge of flag).

Appellant has demonstrated no such governmental compulsion in this case. He has pointed to no government action that "requires affirmation of a belief and an attitude of mind." *Barnette,* at 632, 63 S.Ct. at 1183. For example, there is no evidence that Georgia requires appellant to carry

---

[8]Having concluded that appellant has failed to demonstrate that the Georgia flag presently imposes a discriminatory racial effect, we need not decide whether discrimination against African-Americans was a motivating factor in the flag bill's passage. *See Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438 (1971) (race-motivated legislation violates Constitution only when it "affect[s] blacks differently from whites").

or display the flag or to participate in ceremonies honoring the flag. The mere fact that appellant may on some occasions be required to enter public buildings that fly the Georgia flag does not infringe upon his First Amendment rights because entering public buildings does not manifest any particular attitude or belief and does not associate appellant with the flag's message. We therefore conclude that the district court properly granted appellees summary judgment on appellant's First Amendment claim. *See Hunt,* 891 F.2d at 1566 (rejecting First Amendment challenge to flying of Confederate flag because "[t]he government of Alabama does not compel its citizens to carry or post the flag themselves, or to support whatever cause it may represent").

IV.

Accordingly, we AFFIRM the district court's order granting appellees' motion for summary judgment.

CA(97)3307,SIZE-1 PAGE,TYPE-PI