**Russell J. HENDERSON, et al.**

v.

**Richard L. STALDER, et al.**

**No. CIV. A. 00–2237.**

United States District Court,
E.D. Louisiana.

Aug. 29, 2000.

590

Simon Heller, Brigitte Amiri, Center for Reproductive Law & Policy, New York City, William E. Rittenberg, Rittenberg & Samuel, LLC, New Orleans, LA, for Russell J. Henderson, Doreen Keeler, Robert H. Loewy, Greater New Orleans Section of the National Council of Jewish Women, plaintiffs.

Thomas Scherer Halligan, Louisiana Department of Justice, Roy A. Mongrue, Jr., Louisiana Department of Justice, Civil Division, Stephen Alexander Quidd, Louisiana Department of Public, Safety & Corrections, Baton Rouge, LA, for Richard L. Stalder, Secretary, Department of Public Safety and Corrections, John Kennedy, State Treasurer, defendants.

### ORDER AND REASONS

DUVAL, District Judge.

Before the Court is plaintiffs' Motion for Preliminary Injunction sought pursuant to Fed.R.Civ.P. 65(a) and (b) [1] which came for hearing on August 23, 2000. Plaintiffs [2] challenge the constitutionality of La. Rev.Stat. 47:463.61 (the "Act") which creates a "Choose Life" prestige Louisiana license plate and a "Choose Life" fund within the state treasury. [3] Plaintiffs contend that a preliminary injunction is necessary because (1) the Act's delegation of a governmental function to Christian fundamentalist organizations violates the Establishment Clause of the First Amendment and (2) in the absence of an injunction, the State of Louisiana (the "State") will be actively engaging in viewpoint discrimination by allowing a pro-life viewpoint to be expressed through license plates, but not a pro-choice view in contravention of the First Amendment right to free speech.

---

1. The Court did not order trial of the action on the merits consolidated with the preliminary injunction as is possible under Rule 65(a)(2).

2. Plaintiffs are Russell J. Henderson, Doreen Keeler, Robert H. Loewy, and the Greater New Orleans Section of the National Council of Jewish Women.

3. The Act states specifically as its purpose:

To enact R.S. 47:463.57, relative to motor vehicles; to provide relative to license plates; to create the "CHOOSE LIFE" prestige license plate; to provide for the issuance of such plate; to provide for a minimum number of applicants; to provide for the design and color of such plate; to provide relative to the fees for such plates; to provide for the creation of the "Choose Life" fund within the state treasury; to provide for the deposit of certain monies into the fund; to provide for the use of such monies; to provide for the qualifications of organizations applying for receipt to such monies; to require annual audit; to create the Choose Life Advisory Council; to provide for membership, terms, duties and pay for members of such Council; to authorize promulgation of rules and regulations; and to provide for related matters.

It should be noted that Act was re-numbered upon codification.

For the reasons that follow, the Court finds that a preliminary injunction must issue.

## The Act

The Act provides that special "prestige" license plates bearing the legend "Choose Life" shall be established by the Department of Public Safety and Corrections ("the Department") provided there are a minimum of one hundred applicants for such plates. The annual fee for such a plate is $25.00, in addition to the regular motor vehicle license fee plus a $3.50 handling fee "to be retained by the department to offset a portion of the administrative costs."

Under the Act's provisions, the revenue generated by the $25.00 surcharge is deposited into the state treasury to be distributed by the State Treasurer upon the recommendation by a "Choose Life" Advisory Council ("the Council"). These distributions must go to organizations established under section 501(c)(3) of the 1954 Internal Revenue Code and which organizations counsel women to place their children up for adoption. The Council is to select the color and design of the plate, is to review grant applications and is to make recommendations about the awarding of the grants. However, the decision with respect to the actual distribution of funds is ultimately to be made by the State Treasurer.

The Council is to be comprised of the president or designee of the American Family Association, the Louisiana Family Forum and the Concerned Women of America organizations. The Council at its discretion may also add members from other specified secular groups.[4] Members of the Council serve for one-year terms, on a voluntary basis. No money is to be distributed to any organization that is involved in or associated with abortion clin-

ics or pro-abortion advertising. Fifty percent of the funds is to be used for the material needs of the expectant mothers considering adoption and the remaining moneys may be used for counseling, training, and providing pregnancy testing but is not to be used for administrative, legal or capital expenditures.

Plaintiffs contend that the Act delegates government functions to Christian fundamentalist organizations, that taxpayer money will be used to administer the Act, that no prestige license plate is available for "pro-choice" citizens and that the statute harms the plaintiffs' religious freedom as the Act places the State's imprimatur on fundamentalist Christian beliefs and advances those beliefs by creating a symbolic union between Christian fundamentalism and the State of Louisiana. As such, plaintiffs argue that a preliminary injunction should be issued to prohibit the defendants, Richard L. Stalder, Secretary, Department of Public Safety and Corrections for the State of Louisiana and John Kennedy, Treasurer for the State of Louisiana from "enforcing or implementing Louisiana House Bill No.2082, codified at La. Rev.Stat. § 47:463.61 (1999) and specifically directing them to halt production of the 'Choose Life' special prestige license plates."

The Court will now turn to the standard it must employ to determine whether a preliminary injunction should issue.

## Standard for Preliminary Injunction

 A preliminary injunction is an extraordinary equitable remedy that may be granted only if a plaintiff establishes the following four elements:

(1) a substantial likelihood of success on the merits;

---

4. Seven groups are delineated; physicians specializing in obstetrics; physicians specializing in pediatrics; women who have surrendered children for adoption; couples who have adopted children; adoption advocacy groups; board-certified social workers; and certified counselors.

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied;

(3) that the threatened injury outweighs any damage that the injunction might cause defendants; and

(4) that the injunction will not disserve the public interest.

*Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir.1999). As such, the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *State of Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975). Plaintiffs must carry the burden of proving all four factors. *Black Fire Fighters Ass'n v. City of Dallas, Tex.,* 905 F.2d 63, 65 (5th Cir.1990). Thus, the first inquiry is whether plaintiffs have a substantial likelihood of success on the merits.

### I. Success on the Merits

#### A. The Establishment Clause Claim

As noted, plaintiffs contend that the Act delegates governmental functions to Christian fundamentalist organizations and that the three council members subscribe to and actively promote Christian fundamentalist beliefs as set forth in their organization's mission statements. Plaintiffs contend that the Act places the State's imprimatur on fundamentalist Christian beliefs and that the statute thus violates the Establishment Clause. As such, plaintiffs contend that the Act does not meet the requisite standard set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) which provides the salient criteria to determine whether a statute violates the Religion Clauses of the First Amendment. Plaintiffs maintain that the organizations do not have to be churches *per se* for purposes of violating the Establishment Clause.

Defendants contend that the funds do not go to the Advisory Council but to organizations that provide secular services to assist pregnant woman in placing their children for adoption and giving them counseling. In addition, the State Trea-

surer (and ultimately through an appropriation bill-the Louisiana legislature) make the final determination as to how much money any organization will receive, not the Council. Defendants also argue that the organizations that comprise the Council are not religious organizations and that they advance certain secular social policies that may be consistent with certain religious beliefs. The mere fact that the organizations' missions statements incorporate religious beliefs does not make them "religious organizations"; the ultimate purpose of the Act is secular. Defendants emphasize that the Council is purely advisory and receives no funds and certainly survives a facial challenge to the statute.

The Supreme Court set out a three part test in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to determine whether plaintiffs can demonstrate a substantial likelihood of success on the merits of the Establishment claim. Those criteria are:

(1) the statute must have a secular legislative purpose;

(2) its principal or primary effect must be one that neither advances nor inhibits religion; and

(3) the statute must not foster an excessive government entanglement with religion.

*Id.* at 403 U.S. at 612–13, 91 S.Ct. at 2111. The Court recognizes that it is beyond cavil that a state can " 'make a value judgment favoring childbirth over abortion, and ... implement that judgment by the allocation of public funds.' " *Rust v. Sullivan,* 500 U.S. 173, 192, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991). Apparently, the exercise of this right is at the core of the Louisiana's legislature enacting the instant Act.

With respect to the first criteria, the statute indeed has a secular legislative purpose. That finding is driven by the Supreme Court's application of the *Lemon* factors in *Bowen v. Kendrick,* 487 U.S.

589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). In that case, the constitutionality of the Adolescent Family Life Act ("AFLA") was at issue. The AFLA provided grants to public or non-private organizations for services and research for premarital adolescent sexual relations and pregnancy. The grants were restricted to programs that did not provide abortions, abortion counseling or referral, and specifically included religious organizations among the agencies that would assist in implementing the purposes of the act. The Court held that the AFLA "was motivated primarily by a secular purpose... the elimination or reduction of social and economic problems caused by teenage sexuality, pregnancy and parenthood." *Bowen*, 487 U.S. at 602, 108 S.Ct. at 2571.

[redacted] Similarly, the Act at issue herein has a secular purpose, to promote adoption as a solution for unwanted pregnancies. Certainly, the purpose of these two statutes is sufficiently similar for the Court to rely on *Bowen*'s analysis in this regard.

[redacted] As to the second criteria, the "primary effect" of the Act at issue herein cannot be said to either advance or enhance religion. Again, the analysis found in *Bowen* provides this Court a touchstone. The Supreme Court characterized the AFLA as follows:

> Simply stated, it authorizes grants to institutions that are capable of providing certain care and prevention services to adolescents. Because of the complexity of the problems that Congress sought to remedy, potential grantees are required to describe how they will involve other organizations, including religious organizations, in the programs funded by the federal grants.... There is no requirement in the Act that grantees be affiliated with any religious denomination, although the Act clearly does not rule out grants to religious organizations. **The services to be provided under AFLA are not religious in character... nor has there been any suggestion that religious institutions or organizations with religious ties are uniquely well qualified to carry out those services.**

*Id.* 487 U.S. at 604, 108 S.Ct. at 2572 (emphasis added).

Under the facts of this case, there is no proof that any of the three groups would constitute a religious institution for the purpose of this analysis. No factual evidence except the mission statements set out in the memorandum has been presented to prove the proposition that the Council is comprised of religious organizations or that they are even associated with an organized church. Moreover, the services to be provided are not religious in character. Under the Louisiana scheme, no preference is made for sectarian organizations to be awarded grants. On the face of the statute, it is impossible to say that the primary effect would be to promote religion.

Furthermore, in the context of AFLA the Supreme Court recognized that the effect of Congress' recognition that religious organizations can help solve problems is at most 'incidental and remote' in advancing religion and would not defeat the viability of this statute. *Id.* at 487 U.S. at 607, 108 S.Ct. at 2573. Also, in the *Bowen* case, the Court found that indeed the fact that religious organizations were receiving funds through the program did not render the AFLA violative of the Establishment Clause because nothing on the face of the act indicated that a significant proportion of the federal funds were to be disbursed to "pervasively sectarian" institutions. The Court noted:

> Indeed, the contention that there is a substantial risk of such institutions receiving direct aid is undercut by the AFLA's facially neutral grant requirements, the wide spectrum of public and private organizations which are capable of meeting the AFLA's requirements, and the fact that, of the eligible religious institutions, many will not deserve the label of "pervasively sectarian."

*Id.* at 487 U.S. at 610, 108 S.Ct. at 2575.

This analysis is equally applicable to the Act at issue herein and results in this

Court's conclusion that plaintiffs do not have a substantially likelihood of proving this element of the *Lemon* analysis. The fact that these three organization are acknowledged as having expertise in the secular mission of the Act would at most have an 'incidental and remote' effect in advancing religion. Likewise, there is no indication that the funds will be disbursed to "pervasively sectarian" institutions.

With respect to whether the Act fosters an excessive government entanglement with religion, again it would appear that plaintiffs do not have a substantial likelihood of proving up this prong. Again, the paucity of evidence with respect to whether the three organizations are "religious" cuts against the plaintiffs at this procedural stage of the proceedings. Considering that AFLA has far more sectarian overtones than the License Plate Act at issue herein, the court is at a loss to find that such "entanglement" is sufficient to find that the Establishment Clause is violated by the Act at issue herein. Furthermore, as noted in *Bowen*, it does not appear that there need be excessive monitoring that would lead to "excessive entanglement" sufficient to render the Act unconstitutional. Grant monitoring alone does not meet the level of entanglement required to violate the Establishment Clause.

### B. The First Amendment Freedom of Speech Claim

Plaintiffs also contend that under the First Amendment and the constitutional right to freedom of speech, the Act is unconstitutional because it discriminates based on viewpoint by allowing only the "pro-life viewpoint to be expressed via special license plates and pro-choice car owners are not given the option of expressing their view on their license plates." *See generally Sons of Confederate Veterans v. Glendening*, 954 F.Supp. 1099, 1103 (D.Md.1997) (refusal to produce and distribute vanity plate for the Sons of Confederate Veterans bearing the organization's name and confederate flag constitute im-

permissible viewpoint discrimination). Defendants respond that the Constitution does not forbid a State, pursuant to democratic processes, from expressing a preference for normal childbirth. *Casey v. Planned Parenthood of SE Penn.*, 505 U.S. 833, 872–72, 112 S.Ct. 2791, 2818, 120 L.Ed.2d 674 (1992). As such, the defendants argue that the cases relied on by plaintiffs are distinguishable, because the State uses the democratic process to select messages that the State itself chooses to make available. Defendants contend then that the license plate is an expression of the State's own speech and does not constitute a forum for First Amendment purposes. Defendants write:

> Louisiana, through its through its democratic process of legislative enactments, makes a varied number of official statutory messages by the state itself available to those who choose an alternative state message instead of the one on the basic license plate and to pay an additional fee for the same. Without statutory authorization for the plate, it cannot be issued; Louisiana has not made its special design motor vehicle license plates a forum for private speech, slogans, mottos and symbols.

(Defendants' Memorandum in Opposition at 9). This contention is an oxymoron. The state is using public property to "speak" to promote its view and to allow members of the motoring public also to "speak" that same message and then contending it has not created a forum for speech.

Alternatively, defendants argue that even if its special design motor vehicle license plates constitute a forum for private speech, the controversy is not ripe as the plaintiffs have not alleged that they ever attempted to obtain a legislative enactment authorizing the private message they seek to display. *Hildreth v. Dickinson* Case No. 99–583–CIV–J–21–A(M.D.Fla. December 22, 1999) (unpublished opinion). Defendants also argue that plaintiffs lack standing because there

is no statute or ordinance that prohibits plaintiffs' own speech again relying on *Hildreth*.

■ The Court will now address whether there is a substantial likelihood of success on the merits with respect to the free speech issue. As so eloquently stated in *Lewis v. Wilson*, 89 F.Supp.2d 1082 (E.D.Mo.2000):

> The First Amendment guarantees freedom of speech. However, it does not grant carte blanche for all speech under all circumstances. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 ...(1985). Rather a governmental entity may "preserve the property under its control for the use to which it is lawfully dedicated." *Id.*, 473 U.S. at 800, 105 S.Ct. at 3448.

*Id.* at 1087. Thus, the inquiry as to whether governmental regulation of putative speech is permissible requires the Court to undertake three discrete steps. First the Court must determine whether the subject of the analysis is speech at all. Second, the Court must determine the nature of the governmentally created forum. Finally, the Court must assess whether the regulation satisfies the requisite standard. *Cornelius*, 473 U.S. at 797, 105 S.Ct. at 3446.

### A. Speech

■ The Supreme Court has examined the issue as to what constitutes "speech" for the purposes of the First Amendment. As stated in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989):

> In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who

viewed it." 418 U.S., at 410–411, 94 S.Ct., at 2730.

*Id.*, 491 U.S. at 404, 109 S.Ct. at 2539. Indeed, the defendants maintain that they are articulating a viewpoint legislatively chosen and embraced by the State. Obviously then the intent of the defendants is to convey a particularized message of the "State's" choosing to promote a "pro-life" agenda through the motor-vehicle driving public who select a "Choose Life" plate. As such, there is a substantial likelihood that the Court will find the First Amendment is triggered under the facts of this case. *Lewis*, 89 F.Supp.2d at 1087.

It must be noted that of the 60–odd acts that establish the various prestige plates available to Louisiana car owners most, if not all, do not concern polemical topics. A random sampling of the title of relevant statutes demonstrates the following prestige plates are available: Special license plates for former prisoners of war, Shriner vehicle plates, special license plates for certain disabled veterans, special Farhad Grotto vehicle license plates, special license plates for Louisiana members and retired members of the reserve forces of the U.S., special college and university license plates, special plates for veterans of the Vietnamese Conflict, the Korean conflict, Purple Heart recipients, veterans of Operation Desert Shield/Desert Storm, Knights of Columbus, the Clergy, World War II veterans, plates to promote child safety, plates for members of the Knights of Peter Claver, plates supporting the Louisiana Black Bear, the Louisiana Quail Unlimited, "Helping Schools", Lions International, Ducks Unlimited, Laos War veterans, Girl Scouts of U.S.A., McKinley High School, "I Support River Region Cancer Center," "Don't Litter Louisiana". Thus, the vast majority of the prestige plates are created and displayed simply to denote that the car owner is member or supporter of a particular organization or cause, and for the most part the organizations represented do not appear to be controversial. The Court now turns to the

issue of what type of forum is created by the license plate, if any.

### B. Forum

 As stated in *Perry Educ. Ass'n v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), "the existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." The Supreme Court has recognized that there are basically three fora: (1) the "traditional public forum," (2) "the designated public forum," and (3) the "nonpublic forum". *Lewis* 89 F.Supp.2d at 1088 *citing Perry*. Examples of traditional public forums are streets and parks that have always been "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. A designated public forum is "a location or channel of communication designated by the government for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Lewis*, 89 F.Supp.2d at 1087 *citing Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955. Finally, a nonpublic forum is any forum which is not by tradition or designation a forum for public communication. *Id.*

As concerns what constraints on speech can be constitutionally imposed by government in these three settings, the court in *Sons of Confederate Veterans, Inc. v. Glendening*, 954 F.Supp. at 1102–03 provided a lucid and succinct analysis:

> The government's regulation of speech in both the traditional and limit-ed or designated public fora is subject to strict scrutiny *United State v. Kokinda*, 497 U.S. 720, 726–27, 110 S.Ct. 3115, 3119–20 (1990). thus, a content-based regulation in either of these fora is presumed unconstitutional and will only be permitted if it is narrowly tailored to serve a compelling government interest. *Perry Education Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954–55. The government may also enforce narrowly tailored and content-neutral time, place, and manner restrictions, if the restrictions serve a significant government interest and leave open ample alternate channels of communication. *Id.* **In the nonpublic forum, however, the government's regulation of speech is subject only to a reasonableness test, but with a requirement ... of viewpoint neutrality. *Kokinda*, 497 U.S. at 727, 110 S. ct. at 3120. Thus, "[c]ontrol over ... a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451.**

*Id.* (emphasis added).

For purposes of this preliminary injunction, plaintiffs have assumed that the prestige license plates at issue herein constitute a non-public forum, and the Court will analyze the issue as such. *See Lewis*, 89 F.Supp.2d at 1089 (by process of elimination, court concluded restriction on a vanity plate constituted restriction arising in a nonpublic forum); *Pruitt v. Wilder*, 840 F.Supp. 414, 417 n. 2 (court "assumed" restriction on a vanity plate constituted restriction arising in a nonpublic forum).[5]

---

5. The Court would note that there is a distinction between a "vanity plate" and a "prestige plate" or a "specialty plate." Vanity plates are where a state will customize the arrangement of letter and numbers to create a plate for one individual and it cannot be duplicated. A prestige plate of specialty plate is where a license plate is created to refer to a specific group like the Shriners or a school.

The plate at issue is a specialty plate. Furthermore, an argument can be made that a specialty plate may constitute a limited public forum, whereas vanity plates should be considered a nonpublic forum. Jack Achiezer Guggenheim & Jed Silversmith, *Confederate License Plates at the Constitutuional Crossroads: Vanity Plates, Special Registration Organization Plates, Bumper Stickers, View-*

### C. Scrutiny with Respect to Nonpublic Forum

The issue thus becomes whether there is a substantial likelihood that the Act is unreasonable in light of the purpose served by the forum or whether the Act is not viewpoint neutral. Here, the defendants have made clear by their argument that there is no intent to be viewpoint neutral. As such, the Court finds that there is a substantial likelihood that plaintiffs will be successful in proving that this Act violates the First Amendment.

 It is beyond peradventure that the State of Louisiana has a right to take a position promoting certain kinds of social behavior; it does so regularly in its legislative enactments and executive decisions. For instance if the State appropriates funds to promote adoption and discourage abortion that is its function and right as a governmental entity. *Casey v. Planned Parenthood of SE Penn.*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). However, once the State creates a forum where viewpoints are expressed, it must be viewpoint neutral. The State has unequivocally taken the stand here that the message "Choose Life" is its own message and that the democratic process, i.e. "the legislative act", will be frustrated if the Act is declared unconstitutional. The State has chosen license plates as a forum for speech. Once it makes this choice it cannot discriminate against another viewpoint.

As stated by District Judge Smalkin of the United States District Court for Maryland

Regardless of the type of forum, any governmental regulation of speech must be viewpoint-neutral. That is, the government may not target the particular views taken by speakers on a subject, "in an effort to discourage one viewpoint and advance another." *See Rosenberger v. Rector and Visitors of University Vir-*

ginia, 515 U.S. 819, ——, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 ... (1995); ... Nor may the government restrict speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at ——, 115 S.Ct. at 2516. When the government denies access to speakers solely to suppress their point of view, "the violation of the First Amendment is all the more blatant." *Id.* The rationale for prohibiting the government from engaging in viewpoint discrimination is that such actions raise " 'the specter that Government may effectively drive ceratin ideas or viewpoints from the marketplace.' "

*Sons of Confederate Veterans, Inc.*, 954 F.Supp. at 1102–03. The right to an abortion is an extremely controversial issue and is the focus of a national debate. To provide through legislation for only one viewpoint to be expressed on such a polemical topic is very likely an unconstitutional restraint of free speech as it restricts the forum to only one view—that being the view of the State.

The Court recognizes that the line of cases upon which plaintiffs rely *Lewis v. Wilson*, 89 F.Supp.2d (E.D.Mo.2000); *Sons of Confederate Veterans v. Glendening*, 954 F.Supp. 1099, 1103 (D.Md.1997); *Pruitt v. Wilder*, 840 F.Supp. 414 (E.D.Va. 1994), all arise in the context of the government **prohibiting** the publication of either a prestige plate for a group (*Sons of Confederate Veterans*) or specific vanity plates denoting either a deity (*Pruitt*) or an allegedly racially charged word—"Aryan-1" (*Lewis*). The Court further understands that the State has not prohibited defendants from publishing their own plate. Nonetheless, the very fact that the defendants insist that this is a state "message" will probably require the Court to find the Act unconstitutional when the actual merits of these claims come to trial.

In *N.A.A.C.P. v. Hunt,* 891 F.2d 1555 (11th Cir.1990) where the court found that flying the confederate flag over the state capitol dome did not violate the free speech clause of the First Amendment, the court noted in dicta:

> As one commentator has noted, "[f]ree speech theory has focused on the government as censor; it has had little to say about the process by which the government adds its voice to the market place." Shriffrin, *Government Speech,* 27 U.C.L.A. L.Rev. 565, 569–70 (1980). Indeed the First Amendment protects citizens' speech only from government regulation; government speech itself is not protected by the First Amendment. *Columbia Broadcasting System, Inc. v. Democratic Nat. Comm.,* 412 U.S. 94, 139 and n. 7, 93 S.Ct. 2080, 2104, and n. 7 (1973) . . . (Stewart, J. concurring).
>
> Restriction on government speech seems to spring from an ideal: "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, . . . (1943). There are three ways in which the government's attempts to prescribe orthodoxy have been restricted. First the government may not abridge "equality of status in the field of ideas" by granting the use of public forums to those whose views it finds acceptable while denying their use to those with controversial views. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 . . . (1972). This concern is especially important when the government's dedication of a forum suppresses controversial or political speech. *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 575 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 . . . (1985). Second, the government may not monopolize the "marketplace of ideas," thus drowning out private sources of speech. *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 . . . (1969). For example the government may not confer radio frequency monopolies on broadcasters it prefers. *Id.* Finally the government may not "compel persons to support candidates, parties ideologies or causes they are against." *Lathrop v. Donohue,* 367 U.S. 820, 873, 81 S.Ct. 1826, 1853, 6 L.Ed.2d 1191, . . . (1961) (Black, J. dissenting). For instance, state citizens may not be compelled to use car license plates carrying messages with which they disagree. *Wooley v. Maynard,* 430 U.S. 705, 717, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1977).

*Hunt,* 891 F.2d at 1565–66. The Court finds this analysis compelling and instructive. *See Coleman v. Miller,* 117 F.3d 527, 530 n. 7.[6]

The defendants argue that because there are so many different types of plates available—upwards of 60—as well as the normal State plate, the State is not compelling the plaintiffs to use a "Choose Life" plate; thus, the Act is not in contravention of the constraints of the First Amendment. This argument fails to recognize that the State has taken the position that this message is its own. As such, it appears at this juncture that the State fails in its responsibility to provide a viewpoint-neutral forum, and the Act will probably be found to be an unconstitutional violation of the First Amendment right to free speech. The plain fact is that plaintiffs are not legislatively authorized to use the forum (i.e. a license plate) to express their view(s), and that forum exists for only one point of view

---

**6.** In *Coleman* and *Miller,* the State had not acted so as to designate state buildings from which controversial flags flew as public property as a forum for public communication. *Hunt,* 891 F.2d at 1566.

as adamantly declared by the State—its own.

### D. Defenses Raised by the Defendants—Ripeness and Standing

Defendants argue that because plaintiffs have not alleged that they have actually gone through the process of obtaining a prestige plate—that is getting 100 signatures on a petition, trying to persuade a state legislator to introduce a bill in the legislature that would establish a pro-choice prestige plate, and then attempting to have such a bill enacted into law—the suit is "premature" and the plaintiffs lack standing. They rely primarily on the analysis found in the *Hildreth* case previously mentioned; however, *Hildreth* can be factually distinguished. In addition, the Court respectfully disagrees with the court's analysis of the issue.

In *Hildreth*, a statute substantially similar to the "Choose Life" plate statute at issue herein was passed by the Florida state legislature and challenged by certain Florida residents as being unconstitutional. Unlike the procedures required in Louisiana, the Florida scheme was much more onerous. The following requirements had to be met prior to the Florida legislature considering authorizing a specialty license plate. Those requirements included: (1) a written request with a general description of the license plate; (2) the results of a scientific sample survey of Florida motor vehicle owners that indicates at least 15,000 motor vehicle owners intend to purchase the proposed plate at the increased cost; (3) an application fee not to exceed $30,000 to defray the Department's costs of developing the new plate; and (4) a marketing strategy outlining short-term and long-term marketing plans; and (5) a financial analysis outlining the anticipated revenues and the planned expenditures of the revenues. That information had to be submitted to the the Department 90 days prior to the convening of the next regular legislative session. If approved by the Florida legislature, the Department would then develop the plate for production.

The *Hildreth* court found that because plaintiffs had not completed any of the above requirements, their claim was not ripe. The court found that the plaintiffs' failure to request the development of a pro-choice license plate pursuant to the applicable statutory mechanism made their claim unripe for judicial determination. The court relied on the following analysis provided by the United States Court of Appeals for the Eleventh Circuit:

> Because both standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong, they overlap to some degree and often collapse into each other. Standing may be distinguished from ripeness, however, because where standing is at issue the question regarding the existence of an actual injury arises from the identity of the parties rather than—as here the non-occurrence of events in the causal chain which may or may not occur.

*Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 n. 3 (11th Cir.1991). The *Hildreth* court then stated:

> Plaintiffs argue that even if they meet the statutory requirements, there is still no guarantee that the legislature will approve their plate. Thus requiring them to comply with the statute would be fruitless. This argument suggests that the Court entertain a conjectural or hypothetical injury. The Court will not do so. Plaintiffs' suggestion that the current political climate does not augur well for the passage of a pro choice license plate law is legally speculative. Since the inability to acquire their desired specialty plate is purely conjectural, so too is any alleged resultant injury.

*Hildreth* at p. 10. The *Hildreth* court also found that plaintiffs lacked standing because the statute at issue therein did not limit or regulate speech in any way. The court saw the act as an opportunity for

speech but not a regulation thereof. The *Hildreth* court ignored that:

"[w]hen the First Amendment is in play, however, the Court has relaxed the prudential limitations on standing to ameliorate the risk of washing away free speech protections." *See Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984). Hence when freedom of expression is at stake:

Litigants... are permitted to challenge a [policy] not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the policy's very existence may cause others not before the court to refrain from constitutionally protect speech or expression.

*Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

*Berner v. Delahanty,* 129 F.3d 20, 24 (1st Cir.1997).

The *Hildreth* court focused on the process rather than the result. As noted, where as here, a forum is involved—viewpoint neutrality is required. By the very act of injecting "the State's position which has been legislatively sanctioned" into a forum, First Amendment injury occurs. In the *Board of Regents of Univ. of Wisconsin v. Southworth,* 529 U.S. 217, 120 S.Ct. 1346, 1356–57, 146 L.Ed.2d 193 (2000), the Supreme Court noted that the "whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent." Furthermore, the Supreme Court has stated:

... when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license. [footnote omitted]. *E.g. Freedman v. Mary-*

*land,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license"); .... *See also Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969) (" 'The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands....' ")

*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988)`

■ Once a forum has been created which allows viewpoint discrimination, it is unconstitutional from the moment the discriminatory forum is created. Thus, the controversy appears to be ripe for adjudication. Those who want to express another point of view should not have to wait a year for the legislature to open the license plate forum particularly in light of the State's pointed espousal of the published opinion to "Choose Life." Once free speech has been abridged in such a manner, there is no case law supporting the proposition that those individuals whose speech has been restrained in this particular forum must wait, a week, a month, or a year to have an opportunity to express an opposing viewpoint in that forum. Thus, it is unlikely that the Court will recognize the defenses raised by defendants.

## II. Irreparable Harm By Denial of Relief

■ The next inquiry with respect to the issuance of a preliminary injunction is whether there is a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied. *Sugar Busters*

*LLC,* 177 F.3d at 265. As a matter of law, federal courts at all levels have recognized repeatedly that constitutional rights violations constitute irreparable harm. *Maxey v. Smith,* 823 F.Supp. 1321, 1328 (N.D.Miss.1993) *citing Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981). "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Maxey,* 823 F.Supp. at 1328. Thus, if a preliminary injunction were not to issue, plaintiffs would most assuredly suffer irreparable harm—the curtailment of the constitutionally protected right to free speech. Therefore, the Court finds that this criteria has been satisfied.

### III. Injury Outweighs Damage Injunction Might Cause Defendants

■ The next inquiry is whether the threatened injury to plaintiffs outweighs the damage an injunction might cause the defendants. *Sugar Busters LLC,* 177 F.3d at 265 (5th Cir.1999). The Court finds that plaintiffs have met this burden as well. The Court is convinced that the threatened constraint on constitutionally protected free speech by the defendants far outweighs the damage that would be imposed by not allowing the publication of the license plates and the dissemination of funds so collected. Defendants themselves have opined that it will be over a year before any monetary benefits that are anticipated under this law would actually be forthcoming.

### IV. Injunction Will Not Disserve the Public Interest

■ Finally, the last factor is whether the injunction will not disserve the public interest. *Sugar Busters LLC,* 177 F.3d at 265 (5th Cir.1999). "Curtailing constitutionally protected speech will not advance the public interest, and 'neither the Gov-ernment nor the public generally can claim an interest in the enforcement of an unconstitutional law.'" *American Civil Liberties Union v. Reno,* 217 F.3d 162 (3rd Cir.2000) *citing ACLU v. Reno,* 929 F.Supp. 824, 866 (E.D.Pa.1996).

### CONCLUSION

Considering the foregoing, the Court finds that all of the factors necessary for a preliminary injunction to issue have been met by plaintiffs. Thus, plaintiffs has demonstrated their entitlement to the equitable relief sought by this motion. Accordingly,

**IT IS ORDERED** that the Motion for Preliminary Injunction is **GRANTED**, and defendants Richard L. Stalder, Secretary, Department of Public Safety and Corrections for the State of Louisiana and John Kennedy, Treasurer for the State of Louisiana are **ENJOINED** from enforcing or implementing Louisiana House Bill No.2082, codified at La.Rev.Stat. § 47:463.61 (1999) and are specifically directed to halt production of the "Choose Life" special prestige license plates.