[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 96-3646

_____

D.C. Docket No. 94-351-CIV-FTM-25 (HLA)

HARLLEE GARGIULO, NT GARGIULO, LP,
REGENCY PACKING CO., GADSDEN TOMATO
CO., QUINCY TOMATO CORP.,

Plaintiffs-Appellees,

versus

G. M. SALES, INC., ROBERT GARY MACKEY,
BANK OF IMMOKALEE,

Defendants,

FIRST BANK OF IMMOKALEE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(December 19, 1997)**

Before HATCHETT, Chief Judge, EDMONDSON and COX, Circuit Judges.

HATCHETT, Chief Judge :

In this case, a bank challenges the district court's judgment requiring it to disgorge funds that it received in breach of a statutory trust established under the Perishable Agricultural Commodities Act of 1930. We reverse the judgment of the district court and remand the case for further proceedings.

## BACKGROUND

Appellant First Bank of Immokalee (the bank) extended a revolving line of credit for $200,000 to G.M. Sales, Inc. (GMS), for GMS's use in its produce purchasing and reselling business.[1] GMS secured the loan with its accounts receivable. The bank initially gave GMS, as advances against the credit line, seventy to eighty percent of the amount of GMS's customer invoices of which the bank approved. The principal of the loan was payable on demand, with the interest due monthly.

GMS customers made all of their payments on GMS's accounts receivable -- including those on which the bank did not advance credit -- directly into a post office box (the lock box), to which only the bank had a key. The bank deposited the checks into GMS's checking account on a daily basis. With regard to the payments for invoices that the bank had advanced GMS credit, the bank then debited GMS's account for the amounts advanced as principal loan payments. GMS paid the interest directly to the bank each month. Raymond Holland, the bank's vice president, testified during his deposition

---

[1] Regency Packing Company was a plaintiff in the district court, and GMS and Robert Mackey, GMS's operator, were additional defendants. They are not parties to this appeal.

that the bank established the lock-box procedure before he began working for the bank in late January 1994.

In the spring of 1994, due to concerns about the credit worthiness of GMS's customers, the bank changed its credit policy with regard to GMS, further limiting the number of customers on whose invoices the bank would advance GMS funds. In April 1994, Holland had a conversation with Gregg Biada, an agent of appellee NT Gargiulo, LP (NTG), during which Biada told Holland that NTG was considering increasing GMS's credit line. Holland gave deposition testimony that Biada wanted to obtain a recent financial statement on GMS, and that Biada told him that NTG had previously allowed GMS a credit increase from $75,000 up to $300,000 or $400,000. Holland testified that it was his impression that GMS was still current on its credit with NTG at the time of the conversation. Holland also asserted that it was not until a month later that Biada informed him that NTG had declined to increase GMS's line of credit.[2] In addition, around this time, a bank customer informed the bank that GMS had failed to pay him for a debt that it owed. GMS, however, disputed this debt.

Beginning in the spring of 1994, GMS became delinquent in its payments to its produce suppliers -- appellees Harllee-Gargiulo, Inc. (Harllee); Gadsden Tomato Company (Gadsden Tomato); Quincy Tomato Corporation (Quincy Tomato); and NTG

---

[2] The district court -- as explained below -- appears to have credited Biada's deposition testimony concerning the conversations, which contradicted that of Holland.

3

(collectively, appellees).[3]  Between June 14, 1994, and August 8, 1994, appellees sent notices to GMS and the United States Department of Agriculture to preserve their rights to trust assets pursuant to the Perishable Agricultural Commodities Act of 1930 (PACA), 7 U.S.C. §§ 499a-499s.  Until July 19, 1994, however, the bank continued to receive principal payments on GMS's loan -- totaling $387,000 -- through the lock box and interest payments in the amount of $4,235.40.  On August 11, 1994, GMS made a final payment to the bank of $30,000, thereby satisfying its loan.  Finally, on September 29, 1994, the bank received a letter from appellees' counsel advising it of appellees' PACA trust claims (the September 1994 letter).  It is undisputed that GMS was never in default on the loan.

In November 1994, appellees brought this action pursuant to the PACA, seeking, among other things, disgorgement of the loan payments that the bank received from GMS in breach of the PACA trust.  The bank moved for summary judgment on the ground that it was a bona fide purchaser for value without notice of GMS's breach of the trust, and thus GMS's loan payments were free of appellees' PACA claims.  Appellees also moved for summary judgment.  In October 1996, the district court denied the bank's summary judgment motion and entered judgment in favor of appellees.

The district court found that (1) GMS's monthly loan repayment schedule began on June 21, 1993; (2) in the spring of 1994, GMS was past due on its loan payments to

_____

[3] The district court found that GMS also became delinquent in its loan payments to the bank around this time.  The bank, however, disputes this finding.

4

the bank; (3) around the same time, the bank changed its policy with regard to GMS and reduced the advances from eighty percent to seventy percent per approved invoice; (4) thereafter, the bank established the lock box to collect payments directly from GMS customers to pay down GMS's loan; and (5) the bank subsequently abandoned the scheduled repayment plan and began to debit GMS's checking account with no consistency as to timing or amount. The district court stated that while no actual default had occurred, the bank, pursuant to its secured loan agreement, diverted PACA trust assets to accelerate the loan repayments. The court also found that when Biada spoke to Holland to get a credit reference for GMS, Biada explained to Holland that GMS was seeking a credit extension, although it was already delinquent in paying NTG approximately $300,000. Holland then gave Biada an unfavorable financial report on GMS. The court thus concluded, among other things, that (1) the bank was not a bona fide purchaser because the loan payments were not "for value," i.e., they were not received in the ordinary course of business; and (2) the bank was aware of GMS's financial troubles and knew or should have known of GMS's breach of the PACA trust. The court awarded Harllee $60,834.50, Gadsden Tomato $79,856.00, NTG $199,767.50, and Quincy Tomato $29,775.00. Appellees moved for an award of prejudgment interest, which the court granted at the rate of 12 percent per annum, calculated from September 29, 1994 -- the date the bank received appellees' notice of their PACA claims -- to October 28, 1996. The court also awarded appellees costs in the amount of $3,678.00.

## ISSUE

The sole issue we discuss is whether the district court erred in granting summary judgment in favor of appellees.

**CONTENTIONS**

The bank contends that it received the payments from GMS in the ordinary course of the repayment of GMS's loan, and thus, the payments were "for value." The bank points to the following as errors in the district court's findings of fact: (1) the lock box was used before the spring of 1994; (2) the lock-box procedure was the routine method of receiving principal loan payments, which were never made in monthly installments; (3) GMS was never delinquent in its loan payments and was never in default on the loan; (4) the evidence is unclear whether the bank changed the amount that it advanced to GMS from eighty percent to seventy percent; and (5) the bank never exercised its rights under the security agreement against GMS's accounts receivable.

In addition, the bank argues that genuine issues of material fact exist as to (1) whether it had a duty of inquiry with regard to GMS's financial status; (2) if so, whether it conducted a reasonable inquiry; and (3) whether such an inquiry would have disclosed the breach of the trust. The bank asserts that when the facts are viewed in the light most favorable to it, they do not support the proposition that the bank knew, before it received the September 1994 letter, that GMS was experiencing financial difficulties. The bank also alleges that even if a duty of inquiry did arise, it inquired about GMS's financial status in the spring of 1994, and GMS never responded. Additionally, the bank contends that the facts demonstrate that a reasonable inquiry would not have revealed any breaches

6

of the PACA trust before June 14, 1994, when Harllee sent GMS the first PACA trust notice. Finally, the bank asserts that even if GMS had disclosed its receipt of the PACA trust notices from appellees, nothing would have indicated to the bank that GMS could not pay the claims as well as its debt to the bank, when GMS's account contained, until August 1994, funds in excess of the PACA claims. Thus, according to the bank, only the August payments from GMS, if any, are subject to disgorgement.

Appellees respond that the bank was not a bona fide purchaser because it did not receive the trust assets in the ordinary course of business, and thus the transfers were not "for value." Appellees contend that the bank enforced its security agreement with GMS through controlling the lock box -- and thereby controlling payments from GMS customers on the accounts receivable -- and through directly contacting GMS customers with regard to when the bank could expect to receive certain invoice payments. In addition, appellees assert that the bank should have known of GMS's breach of the PACA trust because the record contains evidence that the bank was aware of GMS's financial difficulties and the PACA itself provides "statutory notice" of such a breach. Appellees also allege that the bank failed to satisfy its duty to inquire whether GMS's loan payments constituted a breach of the trust, and that such an inquiry would have revealed GMS's breach.

## DISCUSSION

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. Coleman v. Miller, 117 F.3d 527, 529 (11th Cir. 1997). Viewing the evidence in the light most favorable to the bank, we must determine

7

whether appellees are entitled to a judgment as a matter of law.  See Coleman, 117 F.3d at 529.  The bank, to oppose the appellees' properly supported motion for summary judgment, must come forward with specific factual evidence, presenting more than mere allegations.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Coleman, 117 F.3d at 529.  Summary judgment is only proper if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file demonstrate that "no genuine issue as to any material fact [exists] and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The PACA creates a statutory trust for unpaid sellers of perishable agricultural commodities and provides that all such commodities, as well as accounts receivable from the sale of such commodities, "shall be held by . . . [the] broker in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment . . . has been received . . . ."  7 U.S.C.A. § 499e(c)(2) (West Supp. 1997); see also C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1313 (11th Cir. 1992).  The PACA grants the sellers of such commodities the right to recover against the purchasers and puts the sellers in a position superior to all other creditors.  Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1067 (2d Cir. 1995).  General principles of trust law govern the PACA trust, and under such principles, even if property is transferred in breach of the trust, a "bona fide purchaser" receives the property free of the trust.  C.H. Robinson Co., 952 F.2d at 1313, 1316.  To qualify as a bona fide purchaser, the bank has the burden of demonstrating that GMS transferred the trust property "for value" and that the bank was "without notice"

of the breach of the trust.  See C.H. Robinson Co., 952 F.2d at 1314.  Although the transfer of a trust asset in satisfaction of an antecedent debt ordinarily is not for value, an exception exists if the transferred property is money.  C.H. Robinson Co., 952 F.2d at 1314; see also Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1380 (3d Cir. 1994).  Lenders, however, who receive PACA trust assets through the enforcement of a security agreement, and not in the ordinary course of business, are not bona fide purchasers because such transfers are not for value.  Consumers Produce Co., 16 F.3d at 1380 n.3, 1382.

In addition, the bank here "had constructive knowledge of the trust because a federal statute created the trust."  C.H. Robinson Co., 952 F.2d at 1315 (internal quotation marks omitted); see also Consumers Produce Co., 16 F.3d at 1381.  Having notice of the existence of a trust, however, is different from having notice of a breach of that trust.  A person has notice of a breach of a trust only if he or she knew or should have known of the breach.  C.H. Robinson Co., 952 F.2d at 1314 (citing Restatement (Second) of Trusts § 297).  In the PACA context, once a lender has knowledge that the borrower/trustee was experiencing financial difficulties, or was failing to pay his or her suppliers, the lender has a duty of inquiry.  Consumers Produce Co., 16 F.3d at 1383.  If such an inquiry would have revealed the breach of the trust, then the person "should have known" of the breach.  Consumers Produce Co., 16 F.3d at 1383.  "The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property."  Consumers Produce Co., 16 F.3d at 1383.

After reviewing the record, we conclude that the district court erred in granting summary judgment in favor of appellees because genuine issues of material fact exist as to whether the bank was a bona fide purchaser and whether the bank was without notice of GMS's breach of the PACA trust. First, genuine issues of fact exist concerning whether the bank received the principal loan payments in the ordinary course of business. The procedures surrounding the use of the lock box appear to be the crux of this determination. From the present evidence, it is unclear (1) whether the bank collected the principal payments on a set monthly schedule or whether it routinely used the lock-box procedure to receive GMS's principal payments; (2) whether the bank instituted the lock-box procedure before or after its change of policy with regard to GMS; and (3) whether the bank used lock boxes with other borrowers or whether the procedure was particular to GMS. The above-mentioned facts are material to the issue of whether the bank was using the lock box to enforce its security agreement with GMS through receiving payments on GMS's accounts receivable directly from GMS customers, or whether this was its standard method of doing business in general and particularly with GMS. See Consumers Produce Co., 16 F.3d at 1380 ("Because [the bank] received PACA trust assets in the ordinary course of business as monetary loan repayments, the transfer was for value.").

In addition, issues of material fact exist concerning the bank's knowledge of GMS's financial troubles and GMS's subsequent breach of the PACA trust. See Consumers Produce Co., 16 F.3d at 1383 (stating that a person has a duty of inquiry if he or she knows that the purchaser/trustee is experiencing financial trouble). First, the bank

10

denies that GMS was ever delinquent in its loan payments and asserts that GMS never defaulted on the loan. Next, questions remain concerning the bank's policy change with regard to GMS, specifically whether the bank reduced the amount that it advanced to GMS against its accounts receivable from eighty percent to seventy percent and, if so, its reasons for doing so. The primary teller who handled the loans and repayments testified consistently that the advance rate was seventy percent. A letter from Holland to GMS's president, however, indicated that as of June 15, 1994, the advance rate decreased from eighty percent to seventy percent. Finally, the court erred in concluding that the bank "was or should have been on notice as to the breach of [the] PACA trust" based on its finding that the bank was aware of GMS's financial difficulties. The bank's being aware of GMS's financial troubles only raised a duty of inquiry on the part of the bank. See Consumers Produce Co., 16 F.3d at 1383. Before the court could decide whether the bank should have known of the breach of the trust, the court had to first determine whether the bank conducted a reasonable inquiry into GMS's financial condition, and whether such inquiry would have revealed the breach of the trust. See Consumers Produce Co., 16 F.3d at 1385 (upholding the district court's determination that the bank had undertaken a "reasonable" inquiry into its borrower's financial condition and that such inquiry did not disclose the breach of the trust).

For the foregoing reasons, we conclude that the district court erred in granting summary judgment for appellees. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.[4]

**REVERSED and REMANDED.**

---

[4] Because of our disposition of this case, we decline to address the bank's remaining issues.