[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12133

_____

In Re: NATHAN AARON FORREST,
MARSHA WEIDMAN FORREST,

Debtors.

_____

SPRING VALLEY PRODUCE, INC.,

PRODUCE EXCHANGE CO., INC.,

FRESH DIRECT, INC.,

S. ROZA & COMPANY, INC.,

Plaintiffs-Appellants,

versus

NATHAN AARON FORREST,

MARSHA WEIDMAN FORREST,

2                    Opinion of the Court                    21-12133

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-bk-03819-RCT

————————————

Before WILSON, BRANCH, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

In this case of first impression, we determine whether the Bankruptcy Code's exception to discharge in 11 U.S.C. § 523(a)(4) applies to debts incurred by a produce buyer who is acting as a trustee under the Perishable Agricultural Commodities Act (PACA). Appellant Spring Valley Produce, Inc. (SVP) is a creditor of Chapter 7 debtors Nathan and Marsha Forrest (the Forrests). The Forrests owe a pre-petition debt for produce which they are seeking to discharge. SVP initiated this adversary proceeding, seeking a declaration that the debt was nondischargeable under § 523(a)(4). The bankruptcy court granted the Forrests' motion to dismiss and held that § 523(a)(4) does not apply to PACA-related debts. After careful review of the briefs and the record and with the benefit of oral argument, we affirm the bankruptcy court's order dismissing SVP's claims because § 523(a)(4) does not except debts incurred by a PACA trustee from discharge.

In so holding, we adopt the following three-part test for determining whether a debtor is acting in a "fiduciary capacity" under § 523(a)(4) in relation to a creditor. First, the relationship must have (1) a trustee, who holds (2) an identifiable trust res, for the benefit of (3) an identifiable beneficiary or beneficiaries. Second, the relationship must define sufficient trust-like duties imposed on the trustee with respect to the trust res and beneficiaries to create a "technical" trust, with the strongest indicia of a technical trust being the duty to segregate trust assets and the duty to refrain from using trust assets for a non-trust purpose. Third, the debtor must be acting in a fiduciary capacity before the act of fraud or defalcation creating the debt.

## I. Factual Background and Procedural History

The undisputed facts are as follows. The Forrests are owners and officers of Central Market of FL, Inc. (Central Market), which buys and sells produce. SVP sold $261,504.15 worth of produce to Central Market for which Central Market never paid. During the transactions at issue, SVP and Central Market were licensed under PACA. SVP preserved its right as a PACA trust beneficiary by including the required statutory statement on its invoices to Central Market. Upon receiving and accepting SVP's produce shipments, Central Market became a PACA trustee of a trust res consisting of that produce.

On May 15, 2020, the Forrests filed a Chapter 7 bankruptcy petition hoping to discharge their business debts, including the debt owed to SVP. On August 14, 2020, SVP commenced this

adversary proceeding, seeking a declaration that the debt is nondischargeable under § 523(a)(4). That statute excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). SVP contended that Central Market incurred the debt "while acting in a fiduciary capacity" because it was serving as a PACA trustee when they failed to pay. And as principals of Central Market, SVP contended, the Forrests were personally liable for that PACA-related debt.

The Forrests moved to dismiss SVP's amended complaint, arguing that a PACA trustee is not acting in a "fiduciary capacity" as that term is understood in the context of § 523(a)(4). Section 523(a)(4) does not apply to PACA-related debts, the Forrests argued, because PACA does not require segregation of trust assets nor prohibit use of trust assets for non-trust purposes. The bankruptcy court granted the Forrests' motion to dismiss. While determining that PACA imposes some trust-like duties, the bankruptcy court found that a PACA trust lacks the crucial element of a segregated trust res. Given the importance of this issue and the split of authority within this circuit, the bankruptcy court certified its order for direct appeal to this court pursuant to 28 U.S.C. § 158(d).

## II. Standard of Review

On direct appeals from the bankruptcy court, we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re Dean*, 537 F.3d 1315, 1318 (11th Cir. 2008). A court's interpretation of the Bankruptcy Code is a

question of law. *Pollitzer v. Gebhardt*, 860 F.3d 1334, 1338 (11th Cir. 2017).

## III. Discussion

The parties dispute the correct test governing the scope and application of 11 U.S.C. § 523(a)(4). We also note that bankruptcy courts within this circuit have generated varying results in applying § 523(a)(4).[1] Therefore, we begin by determining the appropriate standard governing § 523(a)(4)'s exception to discharge.

## A. The § 523(a)(4) Exception to Discharge

The general rule is that an individual debtor's pre-bankruptcy debts are dischargeable in a Chapter 7 bankruptcy case. *In re Fernandez-Rocha*, 451 F.3d 813, 815–16 (11th Cir. 2006). Section 523 of the Bankruptcy Code lists various exceptions to this general rule of discharge. *See generally* 11 U.S.C. § 523. These exceptions are construed narrowly. *In re Fernandez-Rocha*, 451 F.3d at 816. The exception at issue provides that debts "for fraud or defalcation while acting in a fiduciary capacity" are discharged. 11 U.S.C.

---

[1] One main point of dispute among bankruptcy courts in this circuit is whether trust assets must be segregated from non-trust assets for § 523(a)(4) to apply. *Compare In re Arthur*, 589 B.R. 761, 770 (Bankr. S.D. Fla. 2018) (concluding that § 523(a)(4) does not apply to PACA trusts because PACA trusts do not require segregation of trust assets), *with In re Tucker*, No. 06-5107, 2007 WL 1100482, at *4–5 (Bankr. M.D. Ga. Apr. 10, 2007) (concluding that the segregation of trust assets is not a requirement and thus § 523(a)(4) applies to PACA trusts).

6                     Opinion of the Court                21-12133

§ 523(a)(4).  For ease of reference, we will often refer to this statutory provision and all earlier versions of the provision as the "Fiduciary Capacity Exception."  We also note that when we use the term "fiduciary capacity" in this opinion, we are referring only to that term as understood in the context of § 523(a)(4).

The Fiduciary Capacity Exception has existed through various bankruptcy statutes in effect since 1841.  *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993) (per curiam).  But these statutes have all used similar language and all versions have referred to "defalcation" and to "fiduciary capacity" or "fiduciary character."  *Id.*  The focus of this case is not the meaning of the term "'defalcation,' a word that only lawyers and judges could love."[2]  *In re Jahrling*, 816 F.3d 921, 925 (7th Cir. 2016).  Instead, this case focuses on the meaning of the term "fiduciary capacity."

The scope of the term fiduciary capacity in § 523(a)(4) is a question of federal law.  *See In re Angelle*, 610 F.2d 1335, 1341 (5th Cir. 1980) (adopting that rule in the context of an earlier version of the Fiduciary Capacity exception).[3]  Early Supreme Court cases interpreting the Fiduciary Capacity Exception have repeatedly stated

_____

[2] "'Defalcation' refers to a failure to produce funds entrusted to a fiduciary."  *Quaif*, 4 F.3d at 955.

[3] We have adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit.  *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

that fiduciary capacity should not be construed expansively and is limited to the concept of "technical" trusts. *Quaif*, 4 F.3d at 953.

### 1. Principles from Early Supreme Court Cases on the Fiduciary Capacity Exception

The following Supreme Court cases provide us with a few key principles on the Fiduciary Capacity Exception. The first case interpreting the Fiduciary Capacity Exception was *Chapman v. Forsyth*, 43 U.S. (2 How.) 202 (1844). There, a principal was seeking to have debts incurred by his factor (or agent) excepted from discharge under the Fiduciary Capacity Exception. *Id.* 206–07. The principal gave cotton to his factor, who was to sell the cotton and remit the proceeds back to the principal. *Id.* at 206. The creditor in that case, the principal, argued that "[a] factor, with goods and money in his hands belonging to his principal, is in estimation of law, a trustee." *Id.* at 204. Thus, the crux of the creditor's argument was that the factor's failure to remit payment to the principal for the sale of the principal's cotton constituted a debt incurred for defalcation while acting in a fiduciary capacity.

The Court rejected this argument. *Id.* at 208. In doing so, the Court noted that if the Fiduciary Capacity Exception "embrace[d] such a debt, it [would] be difficult to limit its application." *Id.* And "[s]uch a construction would have left but few debts on which the law could operate." *Id.* The Court did agree that "[i]n almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust." *Id.*

But the Court ultimately held that the Fiduciary Capacity Exception "speaks of *technical trusts*, and not those which the law implies from the contract" and held that a principal-factor relationship did not fall within the exception. *Id.* (emphasis added).

Put differently, fiduciary capacity refers to a trust "in its technical sense." *Upshur v. Briscoe*, 138 U.S. 365, 375 (1891). In *Upshur*, the Court focused on the prepositional phrase "while acting in" and concluded that the Fiduciary Capacity Exception "would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created." *Id.* at 378. Thus, the Court added a temporal limitation to the Fiduciary Capacity Exception in which the fiduciary obligations must predate the act of defalcation by the debtor.

The last Supreme Court case addressing the meaning of fiduciary capacity and technical trusts was *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934).[4] There, the creditor had a chattel mortgage in automobiles sold by the debtor. *Id.* at 330. The debtor sold one of the cars but failed to remit payment to the creditor. *Id.* When the debtor filed for bankruptcy, the creditor sought to have the debt on the mortgaged automobile excepted from discharge under the Fiduciary Capacity Exception and sued for conversion of the automobile. *Id.* at 330–31.

---

[4] The Court did address § 523(a)(4) in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), but that case focused on the meaning of defalcation and did not address technical trusts.

The Court asked whether the debtor, who held mortgaged property, was "a trustee in that strict and narrow sense" of the Fiduciary Capacity Exception. *Id.* at 333. The Court reaffirmed the principle that the debtor must be acting in a fiduciary capacity before the act of defalcation. *Id.* The Court found that "[i]t is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio." *Id.* While the documents executing the transaction characterized it as a trust relationship, the Court placed no emphasis on what the transaction was called, but instead focused on the substance of the transaction. *Id.* at 334. And there, "[t]he substance of the transaction [was] this, and nothing more, that the mortgagor, a debtor, has bound himself by covenant not to sell the mortgaged chattel without the mortgagee's approval." *Id.* The Court then said that "[t]he resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust" and concluded that the Fiduciary Capacity Exception did not apply to this type of transaction. *Id.*

These early Supreme Court cases thus give us the following rules. First, the Fiduciary Capacity Exception does not apply to trusts implied by contract but applies to technical trusts or trusts in the technical sense. *Chapman*, 43 U.S. at 208. Second, the debtor must be acting in a fiduciary capacity before the act of defalcation creating the debt for the exception to apply. *Upshur*, 138 U.S. at 378. Third, the substance of the transaction, rather than its form,

controls in determining whether a transaction fits the "strict and narrow" definition of a technical trust. *Davis*, 293 U.S. at 333–34.

### 2. A Technical Trust Requires A Trustee, an Identifiable Beneficiary, an Identifiable Trust Res, and Sufficient Trust-Like Duties

Although the Supreme Court has not provided a precise definition of technical trusts, we can look to definitions of trusts and general trust principles for clarity. As the Court in *Chapman* noted, there are two ways to look at the term "trust." 43 U.S. at 208. In a broad sense, the Court reasoned that there is some degree of "trust" imposed in almost all commercial transactions. *Id.* The Court rightfully chose not to extend the Fiduciary Capacity Exception to this broad definition of trusts because doing so would except an inordinate number of debts from discharge. Instead, the Court limited the exception to technical trusts or trusts in the "technical sense." *Upshur*, 138 U.S. at 375.

Legal definitions on trusts provide the following insight on the distinction between trusts in a broad sense and trusts in a technical sense:

> In its technical sense, a trust is the right, enforceable solely in equity to the beneficial enjoyment of property, the legal title of which is vested in another and implies separate coexistence of the legal and the equitable titles vested in different persons at the same time; in its more comprehensive sense the term embraces every bailment, every transaction by agent or

> factor, every deposit, and every matter in which the slightest trust or confidence exists.  The word *trust*, however, is frequently employed to indicate duties, relations, and responsibilities which are not strictly and technically trusts.

*Trust*, Black's Law Dictionary (11th ed. 2019) (citing William C. Dunn, *Trusts for Business Purposes* 2 (1922)).

This distinction between trusts in the technical sense and trusts in the more comprehensive or broad sense tracks with the Supreme Court's reasoning in *Chapman*.  For example, the broad definition of trusts would include the principal-factor relationship at issue in *Chapman*.  But trusts in the technical sense are much narrower and include specific rights that do not exist in the broad or comprehensive definition of trust.

The Restatement (Third) of Trusts provides further insight on the characteristics of this narrower definition of trusts:

> In the strict, traditional sense, a trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries.

Restatement (Third) of Trusts § 2 cmt. f (2003).

As the Court noted in *Davis*, the Fiduciary Capacity Exception speaks of trusts in a "strict and narrow" sense. 293 U.S. at 333. Thus, for the Fiduciary Capacity Exception to apply, the relation between the creditor and the debtor must resemble this narrower definition of trusts, or trusts in the technical sense. Although we have not spelled out these three elements before, our decisions on the Fiduciary Capacity Exception have generally looked to whether the statute requires the debtor to hold trust property for the benefit of the creditor. *See Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir. 1980) (finding that the debtor was acting in a fiduciary capacity where the statute "clearly define[d] the trust res"); *In re Fernandez-Rocha*, 451 F.3d at 818 (finding that the debtor was not acting in a fiduciary capacity where statute did not "require a doctor to place funds 'in trust' for the benefit of third party patients").

As the Restatement notes, a trust in the "strict, traditional sense" involves duties imposed on the trustee with respect to the trust res and the beneficiary. And in analyzing whether a statutory trust can meet the narrow definition of a technical trust under the Fiduciary Capacity Exception, we have generally looked to the duties imposed by the statute. Thus, along with having an identifiable trustee, beneficiary, and trust res, a technical trust for purposes of § 523(a)(4) should also impose sufficient trust-like duties.[5]

---

[5] This definition of technical trusts also follows how many bankruptcy courts in this circuit have defined technical trusts in applying the Fiduciary Capacity

### 3. Trust-Like Duties Sufficient to Create a Technical Trust

The core issue here is what type of trust-like duties are sufficient to create a technical trust under the Fiduciary Capacity Exception. While we have never expressly held what trust-like duties would be sufficient, we are not writing on a clean slate. Our precedent has generally emphasized two duties: the duty to segregate trust assets and the duty to refrain from using trust-assets for non-trust purposes. The parties dispute whether either of these duties is a requirement for a technical trust. SVP contends that these duties are not required and that the PACA statutory trust imposes other duties that are sufficient. The Forrests respond that PACA fails to meet the narrow definition of a technical trust under § 523(a)(4) because it does not require segregation of trust assets, nor does it prohibit the use of trust assets for a non-trust purpose, and under our caselaw, the duty to segregate trust assets is a requirement for the Fiduciary Capacity Exception to apply. In its reply brief, SVP argues that a PACA trust imposes sufficient segregation and does not expressly permit the use of trust assets for a non-trust purpose.

---

Exception. For example, one bankruptcy court adopted the rule that a technical trust requires "a segregated trust res, an identifiable beneficiary, and affirmative trust duties established by contract or by statute." *In re Triggiano*, 132 B.R. 486, 490 (Bankr. M.D. Fla. 1991). Another bankruptcy court adopted a different three-part test, reasoning that a technical trust requires "sufficient words to create a trust, a clearly defined trust res, and an intent to form a trust." *In re Davis*, 115 B.R. 346, 350 (Bankr. N.D. Fla. 1990).

Given this dispute among the parties, and bankruptcy courts within this Circuit, we review our caselaw, as well as the decisions of our sister circuits, to determine what trust-like duties are sufficient for a statute to create a technical trust. In doing so, we note that state law may provide different definitions or requirements of a trust generally, but the scope of fiduciary capacity under § 523(a)(4) is a question of federal law. *In re Angelle*, 610 F.2d at 1341.

There are only five published decisions in this Circuit and the former Fifth Circuit discussing the Fiduciary Capacity Exception. Of those five, four dealt with the concept of statutory trusts. Statutory trusts fall somewhere between the traditional categories of a trust created voluntarily between the parties by contract, known as an express trust, and a trust created by operation of law, known as a constructive or resulting trust. *Quaif*, 4 F.3d at 953. While express trusts might fall under § 523(a)(4), resulting trusts do not because they fail the basic requirement that the debtor must be acting in a fiduciary capacity before the act of defalcation creating the debt. *Id.* In determining whether a statutory trust constitutes a technical trust under § 523(a)(4), we have looked to the trust-like duties imposed by a statute. In the two cases in which we found that a statutory trust did create a technical trust, the trust-like duties that were sufficient consisted of the duty to segregate trust assets or the duty to refrain from using trust assets for a non-trust purpose.

Starting with cases from the former Fifth Circuit, the first case addressing § 523(a)(4) was *Carey Lumber Co. v. Bell*. At issue there were Oklahoma lien trust statutes requiring that funds "received under any mortgage given for the purpose of construction or remodeling any structure shall upon receipt by the mortgagor be held as trust funds for the payment of all valid lienable claims due." *Carey Lumber*, 615 F.2d at 373 n.2. The Oklahoma statutes further provided that "[s]uch trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing shall have been paid." *Id.* We rejected the debtor's argument that the Fiduciary Capacity Exception did not apply, finding that "the Oklahoma statutes clearly define the trust res and charge the trustee with affirmative duties in applying the trust funds." *Id.* at 374. Thus, we found that the statutes' duties to hold funds in trust and that trust funds could be used only for trust purposes was sufficient for the debtor to be acting in a fiduciary capacity. *Id.*

Another case, *In re Cross*, addressed whether a debtor was acting in a fiduciary capacity based on a contract between the parties, not a statute. 666 F.2d 873, 876 (5th Cir. Unit B 1982). The debtor was in construction and entered into a contract with the creditor where the creditor would provide funds to the debtor to build a post office. *Id.* We found that this contract did not establish a fiduciary duty, noting the contract did not require the debtor "to maintain a segregated account" for the construction funds received from the creditor. *Id.* at 881. Similarly, in *In re Angelle*, we

doubted "that a statute which merely makes misappropriation of funds a crime without, for example, *requiring segregation of accounts* would be enough to charge the parties with an intent to create a trust." 610 F.2d at 1340 (emphasis added).

The first case decided by the Eleventh Circuit on the Fiduciary Capacity Exception was *Quaif v. Johnson*. There, the statute at issue was a Georgia statute that required insurance agents to hold insurance premium payments from insured parties in a separate account and prohibited insurance agents from commingling the premiums with their personal funds. 4 F.3d at 953. In holding that the Georgia statute created a technical trust and that the Fiduciary Capacity Exception applied, we noted the following:

> It is true that some cases have indicated that a separation of the funds is necessary to establish the existence of a technical trust. *See Matter of McCraney*, 63 B.R. 64, 67 (Bankr. N.D. Ala. 1986); *In re Kelley*, 84 B.R. 225, 230 (Bankr. M.D. Fla. 1988). However, the court does not believe that a separation of premium funds *into distinct bank accounts* is an essential requirement of a trust. The Georgia statute requires that the premiums must be separate from other types of funds, but may be kept in a common premium account as long as there were adequate records of the sources of these funds. The court finds that this is sufficient "segregation" to satisfy the requirement that the fiduciary duties be created prior to the act of defalcation.

*Id.* at 954.

The parties, and bankruptcy courts in this Circuit, dispute whether this paragraph from *Quaif* expressly held that the duty to segregate trust assets is a requirement for a technical trust to exist, or whether it is only a factor in the analysis. We do not read *Quaif* to stand for the proposition that a segregation of funds requirement is always necessary for a technical trust to exist. In fact, we noted that bankruptcy courts have adopted this rule, but we chose not to adopt it. And while the phrase "sufficient 'segregation'" could be interpreted as a segregation requirement, when read in context it seems to be more of a reference to the requirement that the Georgia statute imposed sufficient duties pre-defalcation. Further, our holding in *Carey Lumber* shows that a statute can impose sufficient duties if it requires that the trustee cannot use trust funds for a non-trust purpose even though the statute did not impose a duty to segregate trust assets. However, when one reads *Quaif, In re Cross*, and *In re Angelle* together, it is apparent that the duty to segregate trust assets is an important factor in the analysis.[6]

We also note that our sister circuits have emphasized the duties to segregate trust assets and to refrain from using trust assets

---

[6] Our most recent published decision addressing the Fiduciary Capacity Exception, *In re Fernandez-Rocha*, involved a Florida statute that required doctors to have sufficient means to pay malpractice claims. 451 F.3d at 815. However, that statute failed to meet the technical trust standard for the more fundamental reason that the statute did not establish a trust res, trustee, and beneficiary. *See id.* at 818 (explaining that the statute did not "require a doctor to place funds 'in trust' for the benefit of third party patients").

for a non-trust purpose.  For example, the Seventh Circuit has held that the hallmarks of an express trust for purposes of the Fiduciary Capacity Exception are "*segregation of funds*, management by financial intermediaries, and recognition that the entity in control of the assets has at most 'bare' legal title to them." *In re Berman*, 629 F.3d 761, 769 (7th Cir. 2011) (alteration adopted and emphasis added).  Similarly, in discussing its caselaw on the Fiduciary Capacity Exception, the Fifth Circuit remarked that although it had "not expressly identified the particular 'trust-like' duty" sufficient for a technical trust, "one such duty has loomed large—the duty that a trustee refrain from spending trust funds for non-trust purposes." *In re Tran*, 151 F.3d 339, 343–44 (5th Cir. 1998).

Further support that the duty to segregate trust assets and the duty not to use trust assets for non-trust purposes are significant duties of a trustee comes from the Restatement (Third) of Trusts. The Restatement lists several duties imposed on trustees, including the duty of loyalty and the duty to segregate and identify trust property.  The duty of loyalty provides that "a trustee has a duty to administer the trust solely in the interest of the beneficiaries."  Restatement (Third) of Trusts § 78(1) (2007).  In other words, the trustee has a duty not to use trust assets for a non-trust purpose.  The Restatement also provides that the trustee has "a duty to keep the trust property separate from the trustee's own property and, so far as practical, separate from other property not subject to the trust." *Id.* § 84.

In short, our caselaw shows that we have not clearly defined a technical trust in any one decision. But synthesizing all of these cases, we hold that the following test applies in determining whether a debtor is acting in a "fiduciary capacity" under § 523(a)(4). First, the fiduciary relationship[7] must have (1) a trustee, who holds (2) an identifiable trust res, for the benefit of (3) an identifiable beneficiary or beneficiaries. This tracks the traditional and narrow definition of trusts in early Supreme Court cases as well as our own approach and the approach taken by bankruptcy courts in this Circuit. Second, the fiduciary relationship must define sufficient trust-like duties imposed on the trustee with respect to the trust res and beneficiaries to create a technical trust. Based on our caselaw, the two most important trust-like duties, and the ones that we have held create a technical trust, are the duty to segregate trust assets and the duty to refrain from using trust assets for a non-trust purpose. Third, the debtor must be acting in a fiduciary capacity before the act of fraud or defalcation creating the debt. *Quaif*, 4 F.3d at 953.

We also emphasize that our holding today is limited to the narrow meaning of "fiduciary capacity" in the context of § 523(a)(4)'s exception to discharge. Our decision does not address whether a fiduciary relationship creates a trust in other contexts. For instance, a statute or contract might define a relationship as

---

[7] The term "fiduciary relationship" here refers to either a statutory trust or an express trust created by contract.

that of a trust, but the scope of fiduciary capacity in the context of § 523(a)(4) is more limited and the exception does not apply simply because the parties or a statute label the relationship as a trust. *See Davis*, 293 U.S. at 334 ("The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust."); *In re Tran*, 151 F.3d at 345–46 (noting that although the statute used the phrase "in trust," it did not create the required fiduciary relationship for § 523(a)(4) to apply). And on that note, although our discussion today focuses on a statutory trust, this analysis should equally apply to trusts created by contract, or express trusts. Courts should be wary of parties using labels like "trust" or "beneficiary" in contracts and, just like a statute, should ensure that the contract meets all the requirements of a technical trust. Further, our decision does not extend to analyzing whether a trustee has committed a breach of trust or to fiduciary relationships not involving trusts.

## B. PACA-Related Debts Are Not Excepted from Discharge Under § 523(a)(4)

With a clear test in place, we now address whether a PACA trustee is acting in a fiduciary capacity in the context of § 523(a)(4).

The sale of perishable agricultural commodities, generally referred to as produce, can be a "real gamble." H.R. Rep. No. 98-543, at 406 (1983). To mitigate the risks facing small-business produce sellers and promote fair practices among dealers, Congress enacted PACA in 1930. 7 U.S.C. § 499a–499t. PACA mandates licensing of all commission merchants, dealers, and brokers who buy

21-12133               Opinion of the Court                    21

and sell produce in interstate commerce.  *Id.* § 499c(a).  Under
PACA, it is unlawful for a produce buyer to fail to deliver prompt
payment to a produce seller, and the seller can sue the buyer for
damages for this unlawful act.  *Id.* §§ 499b(4), 499e(a).

Congress further amended PACA in 1984 to establish a stat-
utory trust between produce buyers and sellers.  *Frio Ice, S.A. v.
Sunfruit, Inc.*, 918 F.2d 154, 156 (11th Cir. 1990).  The PACA trust
was created in response to the unfavorable practice of produce buy-
ers granting a security interest in their unpaid produce to lenders,
leading to an increase in delinquent payments.  *Id.*  The PACA stat-
ute provides, in part, that:

> Perishable agricultural commodities received by a
> commission merchant, dealer, or broker in all trans-
> actions, and all inventories of food or other products
> derived from perishable agricultural commodities,
> and any receivables or proceeds from the sale of such
> commodities or products, shall be held by such com-
> mission merchant, dealer, or broker in trust for the
> benefit of all unpaid suppliers or sellers of such com-
> modities or agents involved in the transaction, until
> full payment of the sums owing in connection with
> such transactions has been received by such unpaid
> suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).  A PACA trust "automatically arises in favor
of a produce seller upon delivery of produce."  *Frio Ice*, 918 F.2d at
156.  To preserve the benefits of the trust, the produce seller must

file written notice of intent to preserve its rights with the United States Department of Agriculture and the produce buyer. *Id.*

### 1. PACA Creates a Trustee, Identifiable Beneficiaries, and an Identifiable Trust Res

Our first step of the analysis under the Fiduciary Capacity Exception looks to whether the statute creates a trustee and identifiable beneficiaries and trust res. Here, the PACA statute, on its face, creates all three. The statute states that "a commission merchant, dealer, or broker" who receives perishable agricultural commodities must hold those items in trust for the benefit of "all unpaid suppliers or sellers of such commodities." 7 U.S.C. § 499e(2). Thus, the produce buyer is acting as a trustee. The beneficiaries are "all unpaid" produce sellers. The trust res consists of produce received "in all transactions," as well as "any receivables or proceeds" of that produce. A PACA trust therefore satisfies the first requirement of a technical trust under § 523(a)(4).

### 2. PACA Does Not Impose Sufficient Trust-Like Duties to Create a Technical Trust

Turning to the second requirement, we must determine whether the PACA statute imposes sufficient trust-like duties to create a technical trust. Aside from the duty to hold produce in trust until produce sellers are paid, the statute itself does not provide any specific duties on the PACA trustee. But the PACA regulations provide further guidance.

The PACA regulations state that "[t]rust assets are to be preserved as a nonsegregated 'floating' trust." 7 C.F.R. § 46.46(b). They also indicate that "[c]ommingling of trust assets is contemplated." *Id.* Congress sought to structure the PACA trust as a nonsegregated trust "to minimize the burden of the PACA trust on produce dealers." *Frio Ice*, 918 F.2d at 159. While the regulations seem to lack the quintessential trust-like duty of segregating trust assets, SVP argues in its reply brief that PACA meets the segregation requirement set out in *Quaif.* According to SVP, the PACA trust is like the statutory trust at issue in *Quaif* because the PACA trust contains a common account for trust property from all the produce sellers. This segregation satisfies the standard in *Quaif*, the argument goes, because we held that further separation into distinct accounts is not a requirement so long as the trust property is held in a separate account from non-trust property. Further, the regulations only refer to the commingling of trust assets, but do not refer to commingling of non-trust assets.

We reject SVP's argument for three reasons. First, SVP seems to equate a nonsegregated trust and segregated trust where the property for multiple beneficiaries is held in a common account. But these are two different concepts. The duty to segregate relates to the "duty to keep the trust property separate from the trustee's own property." Restatement (Third) of Trusts § 84 (2007). Thus, if a trust is "nonsegregated," then that implies that trust permits trust assets to be in the same account as non-trust assets.

Second, SVP conflates the terms "commingle" and "mingle." "Mingle" refers to the interaction of property from different trusts. *Id.* cmt. c. This is what we were addressing in *Quaif* where we held that it was sufficient to keep the insurance premiums in a common account. Mingling is permitted when it is "impractical or undesirable" to maintain separate account as long as accurate records are maintained and the funds are not put into the trustee's personal account. *Id.* On the other hand, "commingle" means "to mix personal funds with those of a beneficiary or client, [usually] in an improper or illegal way." *Commingle*, Black's Law Dictionary (11th ed. 2019). Thus, the phrase "[c]ommingling of trust assets is contemplated" refers to the commingling of trust assets with non-trust assets.

Third, the PACA statute is distinguishable from the statute in *Quaif* because, there, the statute expressly forbade the insurance agent from commingling insurance premiums with his personal funds. *Quaif*, 4 F.3d at 953. The PACA statute contains no such provision. On the contrary, the PACA regulations suggest that commingling is permitted. We therefore conclude that PACA does not impose the important trust-like duty to segregate trust assets.

Also lacking from the PACA statute is the duty to refrain from using trust-assets for a non-trust purpose. The Forrests argue that PACA permits a PACA trustee to use trust assets for a non-trust purpose. They cite to the Federal Register discussing the PACA trust which states that:

21-12133                 Opinion of the Court                 25

> Trust assets are available for other uses by the buyer or receiver.  For example, trust assets may be used to pay other creditors.  It is the buyer's or receiver's responsibility as trustee to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment, including sufficient assets to cover the value of disputed shipments.

Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust. 49 Fed. Reg. 45735-01, 45738 (Nov. 20, 1984).

In its reply brief, SVP contends that the PACA trustee cannot use trust assets for non-trust purposes "if doing so results in the trustee having an insufficient amount to pay the outstanding PACA Trust claims."  This is because, SVP argues, the PACA regulations require the PACA trustee "to maintain trust assets in a manner so that the trust assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities."  7 C.F.R. § 46.46(d)(1).  According to SVP, the only situation when the PACA trustee can use trust assets for a non-trust purpose is when there is an excess amount in the trust and doing so would not dissipate the trust.  And, the argument goes, this excess amount would not constitute PACA trust assets.

We find this argument lacks merit.  The PACA statute provides that the trust consists of produce received as well as proceeds from the sale of that produce.  7 U.S.C. § 499e(c)(2).  Consider the following scenario.  A produce buyer buys $10,000 worth of fruits

and vegetables from a produce seller. Those items go into the PACA trust. The produce buyer then sells that produce to its customers for $12,000, netting a profit of $2,000. As that $12,000 is proceeds of the produce received, it is a trust asset and goes back into the PACA trust. But since the produce buyer has an outstanding debt to the produce seller of only $10,000, the produce buyer could spend up to $2,000 of trust assets for a non-trust purpose while still upholding its duty to maintain enough assets to satisfy outstanding claims. Thus, the PACA statute and accompanying regulations do not prohibit the use of trust assets for non-trust purposes, and it could be permissible to do so in certain situations.

Despite the absence of a requirement to segregate trust assets and to refrain from using trust assets for a non-trust purpose, SVP maintains that PACA imposes other trust-like duties sufficient to create a technical trust. In particular, SVP points to the following duties: the trustee must hold all assets subject to the PACA trust for the benefit of unpaid produce sellers until they receive full payment; the trustee must maintain sufficient trust assets to satisfy outstanding debts to unpaid produce sellers; and the trustee must keep accurate records of all transactions for a period of two years.

Starting with the trustee's obligation to hold trust assets for the benefit of unpaid produce sellers until they receive full payment, this is not so much a duty, but rather goes to the first part of our test in determining whether a statute creates a trustee, beneficiary, and trust res. Under the second part of our test, we focus on the duties of the trustee to manage the property being held in trust.

And here, PACA does not impose the typical trust-like duty of segregation nor does it prohibit the trustee from using the trust assets for a non-trust purpose. Further, the statute does not expressly say that PACA beneficiaries must be paid from the PACA trust. Instead, the statute provides that the trust assets must be held in trust "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents." 7 U.S.C. § 499e(c)(2). But the statute does not specify whether the unpaid produce sellers are to be paid with funds from the PACA trust or funds from another source.

Next, we recognize that the PACA regulations do impose a duty on the trustee to maintain sufficient assets to satisfy outstanding debts, but we are not convinced that this duty is "trust-like" in nature. SVP cites no authority suggesting that this is a typical trust-like duty rather than a means to enforce the contractual obligations of the produce buyer to pay the produce seller. After all, "the central purpose of [the PACA trust] is to ensure payment to trust beneficiaries." *Frio Ice*, 918 F.2d at 159.

Lastly, SVP is correct that the duty to keep accurate records is a typical trust-like duty. *See* Restatement (Third) of Trusts § 83 (2007) ("A trustee has a duty to maintain clear, complete, and accurate books and records regarding the trust property and the administration of the trust."). However, we find that this trust-like duty alone cannot create a technical trust absent the important trust like duties of segregation and refraining from using trust assets for a non-trust purpose.

SVP also argues that general principles of trust law impose additional duties on PACA trustees, citing our decision in *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995 (11th Cir. 1997). There, we reaffirmed the rule that "[g]eneral principles of trust law govern the PACA trust, and under such principles, even if property is transferred in breach of the trust, a 'bona fide purchaser' receives the property free of the trust." *Id.* at 999. But that case was in the context of a PACA creditor seeking disgorgement of loan payments to banks made with PACA trust funds. *Id.* at 998. The "[g]eneral principles of trust law" in *Gargiulo* thus refer to the circumstances under which a PACA creditor could disgorge those payments. *Id.* at 999. Further, a PACA trustee who misappropriates PACA trust funds might be in "breach of trust," *id.* at 999, but when analyzing the Fiduciary Capacity Exception, we are determining whether the fiduciary relationship between the debtor and creditor meets the narrower definition of a technical trust. Thus, our holding today that a PACA trustee is not acting in a fiduciary capacity in the context of § 523(a)(4) does not affect a determination on whether a PACA trustee's misuse of trust assets constitutes a breach of trust. In addition, our holding does not impact the legal definition of PACA assets as trust assets, thus entitling PACA creditors to priority in bankruptcy proceedings. *C.H. Robinson Co. v. Tr. Co. Bank, N.A.*, 952 F.2d 1311, 1315 n.3 (11th Cir. 1992) ("Trust assets are actually exempt from the bankruptcy estate, and all trust beneficiaries must be paid in full before any remainder is distributed to secured creditors.").

In sum, the second step of our analysis under the Fiduciary Capacity Exception requires us to examine the trust-like duties imposed by the statute on the trustee. And here, we find that PACA does not impose sufficient trust-like duties to create a technical trust. Two of the hallmark duties of a technical trust are not imposed by the statute: the duty to segregate trust assets and the duty to refrain from using trust assets for a non-trust purpose. To the contrary, the PACA regulations suggest that commingling and the use of PACA trust assets for non-trust purposes is permitted. PACA does impose other duties on produce buyers, but one of these duties is not necessarily trust-like in nature and the remaining duties are simply not sufficient to meet the narrow definition of a technical trust.

### 3. A PACA Trust More Closely Resembles A Constructive or Resulting Trust

Based on our decision in *Frio Ice*, we find that a PACA trust bears closer resemblance to a constructive or resulting trust than a technical trust. As discussed, constructive or resulting trusts do not qualify as technical trusts under § 523(a)(4) because they do not meet the third requirement that the debtor must be acting in a fiduciary capacity before the act of defalcation creating the debt. In *Frio Ice*, the issue was whether a district court could order an injunction to enforce payment from a PACA trust. *Frio Ice*, 918 F.2d at 155; *see also* 7 U.S.C. § 499e(c)(5) ("The several district courts of the United States are vested with jurisdiction specifically to entertain . . . actions by trust beneficiaries to enforce payment from the

trust."). We held that "[u]pon a showing that the trust is being dissipated or threatened with dissipation, a district court should require the PACA debtor to escrow its proceeds from produce sales, identify its receivables, and inventory its assets." *Frio Ice*, 918 F.2d at 159 (footnote omitted). In other words, a district court can order the PACA trustee to segregate trust assets upon a showing that the trust is being dissipated. In fact, we noted that "[s]egregation often may be the only means by which a federal court can prevent dissipation." *Id.* If segregation of trust assets is a strong indicator of a technical trust and that duty is only imposed after an act of defalcation—*i.e.*, dissipation of trust assets—then a PACA trust resembles a constructive or resulting trust to which § 523(a)(4) would not apply.

### 4. SVP's Policy Arguments Are Not Persuasive

We now turn to the policy arguments made by SVP. While we are convinced that a PACA trust does not meet the narrow exception to discharge in § 523(a)(4), we recognize that this case involves two statutes with competing interests. As many courts have made clear, whether § 523(a)(4) discharges a PACA trustee's obligations "represents a tug-of-war between two competing federal statutes." *In re Villa*, 625 B.R. 111, 121 (Bankr. N.D. Fla. 2021). On the one hand, the Bankruptcy Code, "grant[s] a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (internal quotation marks omitted). And on the other hand, PACA was enacted "to encourage fair trading practices in the marketing of perishable commodities." *Frio*

*Ice*, 918 F.2d at 155.  Our holding today balances these two interests.

SVP contends that our holding is contrary to Congress's intent, will negatively impact the produce industry, and will erode the protections afforded by PACA.  First, SVP argues that because Congress amended PACA in 1984 and amended § 523(a)(4) in 2005, this timing difference shows that Congress could have chosen to exclude PACA trust obligations from § 523(a)(4) but chose not to.  However, we find that this timing-difference argument cuts both ways.  As the bankruptcy court below noted, "Congress has never been shy or reluctant about enacting express exceptions to the bankruptcy discharge."  Congress has enumerated nineteen exceptions to discharge.  *See* 11 U.S.C. § 523(a)(1)–(19).  While Congress could have chosen to exclude PACA-related debts from § 523(a)(4), it is just as possible that Congress could have chosen to add an express exception to discharge for those debts.

SVP also suggests that Congress could have classified PACA debts as ordinary business debts and imposed other remedies for produce sellers such as liens.  But instead, Congress chose to impose a trust relationship between produce buyers and sellers.  SVP argues that the purpose of this was to except PACA debts from discharge under § 523(a)(4).  This argument too lacks merit.  SVP cites no support in the PACA statute or regulations showing that this was Congress's purpose in creating the PACA trust.  On the contrary, the statute provides that the purpose of the PACA trust was to address the "burden on commerce in perishable agricultural

commodities" resulting from produce buyers granting security interests in their unpaid produce to lenders. 7 U.S.C. § 499e(c)(1). Because Congress labelled PACA debts as trust property, "secured lenders will be forced to return trust property they have received unless they can establish their status as bona fide purchasers." *C.H. Robinson Co.*, 952 F.2d at 1315. Thus, the PACA trust provides PACA creditors with a means to disgorge payments made from the PACA trust to third-party lenders. Further, the status of PACA debts as trust property entitles PACA creditors to the highest priority in bankruptcy proceedings. *See id.* ("[W]hen trust assets are distributed in bankruptcy, trust beneficiaries are to be paid first."). Therefore, without support to the contrary, we are not convinced that the purpose of the PACA trust was to except a produce buyer's debts from discharge when there remain other benefits of labelling those debts as assets of a trust.

Finally, SVP argues that not excepting PACA-related debts from discharge will leave PACA creditors without recourse. But as we have already noted, there are several avenues of recourse remaining to PACA creditors. They can seek disgorgement of payments made in breach of the PACA trust, and they are entitled to the highest priority in bankruptcy. In addition, PACA beneficiaries can obtain injunctive relief in district court to have trust assets segregated for the benefit of all unpaid produce sellers. *Frio Ice*, 918 F.2d at 159.

Allowing PACA debtors to be freed from personal liability for their debts through bankruptcy discharge promotes the

overarching goal of the Bankruptcy Code of providing debtors with a fresh start. At the same time, PACA still provides significant benefits to unpaid produce sellers as those creditors are entitled to the highest priority in a Chapter 7 liquidation. Our decision will not erode the protections of PACA and will strike a balance between these two statutes.

## IV. Conclusion

We hold that debts incurred by a produce buyer acting as a PACA trustee are not excepted from discharge under § 523(a)(4). While a PACA trust does identify a trustee, beneficiary, and trust res, thus satisfying the first step of our analysis, it does not impose sufficient trust-like duties to fit the narrow definition of a technical trust under § 523(a)(4). PACA does not impose the duties to segregate trust assets and refrain from using trust assets for a non-trust purpose, which are strong indicia of a technical trust. Instead, a PACA trust more closely resembles a constructive or resulting trust, which do not fall within § 523(a)(4)'s exception to discharge. Therefore, we affirm the bankruptcy court's order dismissing SVP's complaint in this adversary proceeding.

**AFFIRMED.**